UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| |
|---|
| DOMINION RESOURCE SERVICES, INC., |
| Plaintiff, |
| v. |
| 5K LOGISTICS, INC., |
| Defendant and Third-Party Plaintiff, |
| v. |
| DAILY EXPRESS, INC. |
| Third-Party Defendant. |

Action No. 3:09–CV–315

MEMORANDUM OPINION

I.  INTRODUCTION

THIS MATTER is before the Court on plaintiff Dominion Resource Services, Inc.'s (hereinafter "Dominion") Motion for Summary Judgment on its breach of agreement claim against defendant 5K Logistics, Inc. (hereinafter "5K"). (Doc. No. 84.)  Dominion seeks $192,072.50 in damages, plus attorney's fees and costs.  After hearing the parties and giving consideration to the briefs, it is the conclusion of the Court that the Motion should be granted.

1

II. BACKGROUND

A. Posture of Case

This case arises out of damages to a 20-ton heat exchanger that fell off of a truck while being transported for Dominion by third-party defendant Daily Express Inc. (hereinafter "Daily Express"), a motor carrier hired by 5K. The accident occurred in 2006 and Dominion filed this suit on April 14, 2009, after failing to receive reimbursement from 5K. 5K has filed a third-party complaint against Daily Express and the heat exchanger's manufacturer.[1] Dominion's Amended Complaint also states claims for negligence and breach of bailment duties. This Motion was filed on February 2, 2010, and oral arguments were heard on February 26.

In considering Dominion's Motion, this Court has reviewed the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" submitted by both parties in order to determine whether there are any genuine issues as to the facts material to Dominion's claims and 5K's defenses. See Fed.R.Civ.P. 56(c). After considering these materials, the Court finds the following facts cannot reasonably be disputed:

1. Dominion, a Virginia corporation, entered into a Master Services Contract (hereinafter "the Contract") with 5K, a Pennsylvania corporation, in January 2004. The Contract provided that 5K would, "from time to time" be requested

---

[1] All pending counts have been dismissed as to the manufacture, Thermal Engineering (USA) International. See Order Granting TEI's Mot. Dis. (November 30, 2009).

by Dominion, "through its duly authorized representatives" to "perform certain work." This work could include "any such [w]ork performed by [5K] in the scope of its usual business" and specifications for this work might be set forth in subsequent "Work Order Agreement[s]." The Contract would "become effective and operative when [5K] first commences the performance of any job or the rendering of any particular service." The parties agreed that the Contract would be governed by Virginia law. (Pl.'s Mem. Sup. Mot. Sum. J., Lord Decl., Ex. 1 at 1 & 22.)

2. The Contract required 5K to perform all work in a "good and workmanlike manner [,] to the full and complete satisfaction of [Dominion]", "subject to all the terms and conditions of [the] Contract" and "any applicable Governmental Requirements." 5K also agreed to employ "sound engineering practices and professional standards, with due diligence and without undue delay or interruption." 5K warranted and guaranteed that all work would comply with the previously mentioned standards, would meet the other terms of the contract, and "be free from defects". 5K further agreed to correct, or pay for the correction of, "all portions of the work that fail to conform to [these] warranties." In addition to these commitments, 5K agreed to "comply with all federal, state and local laws, rules, regulations and ordinances applicable to the performance of the work." (Lord Decl., Ex. 1 at 1, 5 & 14.)

3. According to the terms of the Contract, any and all provisions that apply to 5K also apply to its "officers, directors, employees, agents and subcontractors".

3

While 5K could, with the permission of Dominion, "assign any rights or delegate any duties or obligations" under the Contract, this assignment would not "relieve [5K] of responsibility for the due and full performance" of the Contract or absolve it from liability for "all acts and omissions of its assignees or other transferees." (Lord. Decl., Ex. 1, at 2 & 18.)

4. Dominion established three standing purchase orders through which 5K billed it for ongoing work on a variety of projects, including the operation of a warehouse and cranes in Chambersburg, Pennsylvania, where the heat exchangers were stored before being loaded. (Def.'s Mem. Op. Mot. Sum. J., Golden Decl., Ex. 2 at 108-112.) Dominion also ordered specific services, including transportation services, by communicating with 5K via e-mail, phone, or fax. (Lord. Decl., Ex. 2 at 18-20, 34-36 & 113.) While no purchase order was ever issued for transportation services, and transportation services were never provided to Dominion using 5K's trucks, 5K did own and operate trucks to move loads. (Golden Decl., Ex. 3 at 12-18.)

5. On August 21, 2006, Dominion contacted 5K and asked it to obtain quotes for the cost of transporting the heat exchangers from the Chambersburg warehouse to a construction site in Lusby, Maryland. (Lord Decl., Ex. 10.) 5K reported that it would cost $1,450 to move each piece of equipment but did not submit further information regarding the identity of the party that would actually transport the equipment. (Lord Decl., Ex. 3 at 55-56, Exs. 4 & 10.)

Dominion agreed to 5K's quoted price and instructed it to transport the heat exchangers. (Lord Decl., Ex. 3 at 55-56.)

6. 5K hired Daily Express to operate the trucks that would move the heat exchangers. On August 24, 2006, 5K loaded the two heat exchangers onto two trucks operated by Daily Express. (Lord Decl., Ex. 2 at 40-57.) The Daily Express drivers charged with securing the loads to the trailer beds did not "overstrap" the two exchangers as required by federal regulations and recommended by industry standards. (Lord Decl., Exs. 13 & 14.) The Daily Express drivers then departed the warehouse facility and began travelling toward Lusby. Enroute, one of the two heat exchangers fell from its trailer, sustaining damage. (Lord Decl., Ex. 14.) The exchanger was remounted and taken to Lusby, where delivery was refused by Dominion. (Lord Decl., Ex. 13.)

7. Dominion later had the damaged heat exchanger repaired by its original manufacturer at a cost of $192,072.50. (Lord Decl., Ex. 2. at 59-61; Ex. 7 at 19-22, 39, 44-45, 49-51; Exs. 18, 19, 20 & 21.)

8. 5K invoiced Dominion for the cost of transporting the two heat exchangers while Dominion attempted to collect reimbursement from 5K. 5K refused to reimburse Dominion. (Lord Decl., Exs. 2 & 23.) In April 2009, Dominion sent a demand letter to 5K and on May 14, Dominion filed a Complaint against 5K.

III. APPLICABLE LAW

A district court has original jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000 and the dispute is between citizens of different States.  See 28 U.S.C. § 1332 (2009).  Where such diversity jurisdiction exists, a district court is to apply federal procedural rules and determine the substantive merits of each claim based on the law under which it arises.  See Hanna v. Plummer, 380 U.S. 460, 465 (1965)(common law claims arise under state law).

A.  Standard of Review on Summary Judgment

Summary judgment "provides a procedure with which to bypass a trial when the fact resolution process of trial would prove to be of no use in the disposition of a case."  Mitchell v. Data General Corp., 12 F.3d 1310, 1315 (4th Cir. 1993).  Thus, the "judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A fact is "material" if it "effects the outcome of the suit under the governing law" irrespective of evidentiary significance, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and it is "genuine" if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Id. at 249 (must be more than a "scintilla").  While a nonmoving party may not resist summary judgment solely by relying on the arguments in its pleadings, a court must credit a

nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor. Id. 248; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)("must do more than . . . show . . . metaphysical doubt as to . . . material facts"); but see Barwick v. Celotex Corp., 736 F.2d 946, 959-60 (4th Cir. 1984)(nonmoving party cannot manufacture issues of fact by contradicting own prior statements). While the nonmoving party need not produce evidence in a form that would be admissible at trial, see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(non-movant need not depose own witnesses, summary judgment may be opposed by material listed in Rule 56(c), but "not mere pleadings themselves"), the Fourth Circuit and others have concluded that inadmissible hearsay cannot be considered on a motion for summary judgment. Maryland Highway Contractors Ass'n, Inc. v. State of Maryland, 933 F.2d 1246, 1251-52 (4th Cir. 1991)(excluding unauthenticated letter and granting judgment in absence of "evidence").

### B. Virginia Breach of Contract Law

Under Virginia law, a party claiming breach of agreement or contract must establish three elements to prevail: first, there must be a legally enforceable obligation under a contract; second, there must be a breach of that obligation; third, injury or damage to the plaintiff must flow from that breach. See, e.g., Sunrise Cont. Care, LLC. v. Wright, 277 Va. 148, 154 (2009)(reversing summary judgment for plaintiff where damages were not linked to breach asserted).

Where two parties have entered into a contract, the terms of their agreement establish a set of duties owed. See, e.g., Pressen v. Ceres Marine Terminals, 5 F.3d

7

734, 738 (4th Cir. 1993)(bill of lading establishes duties in admiralty). The interpretation of a contract to determine the nature and scope of these duties is typically a question of law, see Williams v. Prof'l Transp. Inc., 294 F.3d 607, 613 (4th Cir. 2002), although the fulfillment of a condition precedent to performance or the occurrence of a breach is typically a question of fact. See Smith v. McGregor, 237 Va. 66, 75 (Va. 1989) (finding that, as a matter of law, presentation of survey of land to be conveyed by contract was a condition precedent to buyer's obligation to tender purchase price, but that, as a matter of fact, survey had not been presented and performance was excused). Under Virginia law, a court will only look past the four corners of a contract when a particular term is ambiguous in light of the facts and circumstances in which the contract was made. Virginia Elect. and Power Co. v. Northern Virginia Regional Park Authority, 270 Va. 309, 319 (2005) (declining to admit separate parole evidence regarding subjective intent). Language is ambiguous if it may be understood in more than one way or when it refers to two or more things at the same time, and where such ambiguity exists, uncertain rights under a contract may be determined and fixed by the course of dealing of the parties. Video Zone, Inc. v. KF & F Properties, L.C., 267 Va. 621, 627 (2004)(declining to overturn grant of summary judgment where judicial construction of contract was in keeping with party's course of performance).

While a party may delegate the performance of its duties under a contract, it may not assign the ultimate obligation to perform without the other party's consent. See Rest.(2d) Cont., § 318(3)(1981); cf. Boland v. Rivanna Ptnrs., 69 Va. Cir. 208, 311-

12 (2005)(landlord may delegate maintenance obligations but not duty to maintain). Thus, under Virginia law, where a party guarantees that "workmanship" will be "first-class" and "satisfactory in every respect", the guarantor must tender performance in a manner which "would be satisfactory to a reasonable man", regardless of whether the guarantor actually performs the work. Lambert v. Jenkins, 112 Va. 376, *719-20 (1911)(guarantee protects contracting party from defective materials used by subcontractor). The same principle has long applied where a guarantee has been made for "all acts or omissions of . . . employees and all subcontractors", Walker Mfg. Co. v. Dickerson, Inc., 619 F.2d 305, 308 (4th Cir. 1980)(general contractor liable for defective roof installed by subcontractor), and is an "unremarkable principle of law". Carrollton Bank v. Fujitsu Transaction Solutions, Inc., 56 Fed. App'x. 603 (4th Cir., Jan. 23, 2003).

The damages claimed by a plaintiff in a breach of contract suit must not only be proven to flow from the breach but must be proven with "reasonable certainty" and not merely based on speculation. Sunrise Cont. Care, LLC, 277 Va. at 148. Further, while a party may only be held liable for the reasonable costs which arise from his breach of an obligation, where a plaintiff presents bills for remedial measures that are reasonable on their face, they constitute at least some evidence of what reasonable damages would be. Walters v. Littleton, 223 Va. 446, 452 (1982)(medical bills sufficient in light of other facts, but not conclusive evidence of reasonable expenses); see also Atlantic Permanent Federal Sav. and Loan Ass'n v.

American Cas. Co. of Reading, Pa., 839 F.2d 212, 218 (4th Cir. 1988)(surveying cases and finding that such bills likely constitute prima facie evidence).

## IV. DISCUSSION

In light of the forgoing findings of fact and the applicable law, it appears that Dominion has shown both the absence of genuine issues of material fact and its own entitlement to judgment as a matter of law on its breach of agreement claim.

First, on the record now before the Court, there cannot be any genuine issue as to the fact that the Master Service Contract created a set of obligations which 5K undertook whenever it performed work for Dominion that was "in the scope of its usual business." The applicability of the Contract thus turns on whether 5K was performing work at the request of Dominion or its "duly authorized representatives", not on the filing of a Work Order Agreement or purchase order, although such a document could impose additional obligations on 5K. While the Contract does not define 5K's usual scope of business, it cannot be disputed that 5K owned and operated trucks and that in its dealings with Dominion under the Contract 5K sought to be, and held itself out as, a one stop shop for Dominion's logistical and transportation needs. Similarly, it cannot be disputed that Dominion, through its representative, asked 5K to transport the heat exchangers. Thus, there can be no real dispute as to the fact that the work was performed under the Contract and that 5K was obligated to perform in a "good and workmanlike manner", as well as to comply with "professional industry standards" and all "laws, rules, regulations and

ordinances applicable" and to perform work "free from defects".  Similarly, there can be no dispute that 5K was obligated to "correct any work or re-perform any work that fails to conform" to 5K's warranties and to indemnify Dominion against any losses, and that "any assignment of this [Contract] shall not . . . relieve [5K] of responsibility for the due and full performance thereof" and "[5k] shall be liable to [Dominion] for all acts and omission of its assignees or other transferees."  Such liability is in keeping with long established Virginia law.  See e.g., Walker Mfg. Co.,  619 F.2d at 308.

While 5K has argued that since the term "scope of . . . usual business" is ambiguous, it should be construed against Dominion in such a way as to exclude services which involve the actual movement of equipment, and not merely the hiring of motor carriers, 5K mistakes the nature of the inquiry at issue.  Defining the term "scope of . . . usual business" does require the Court to refer to facts and circumstances beyond the four corners of the Contract.  However the understanding of any term within a document requires reference to facts and circumstances in the actual world.  See, e.g., Virginia Elec. and Power Co., 270 Va. at 319.  The mere fact that the phrase "scope of . . . usual business" is undefined in the contract does not make it susceptible to multiple meanings or ambiguous.  5K had a usual scope of business at the time it signed the Contract and this business including moving loads on trucks, thus, in light of the facts and circumstances in existence at the time of the Contract's signing, there is no ambiguity as to whether the services at issue here were covered.  Further, to the extent that the term is ambiguous, 5K's hiring of contractors unknown to Dominion and billing of Dominion directly for the services

11

rendered, strongly suggests that 5K was acting as a general contractor and not merely as a broker of services. In any event, 5K has produced no evidence other than the bald assertions of its own employees that such a distinction is appropriate, and this is not enough to create an issue for trial by a jury. See Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 586; also Barwick, 736 F.2d at 959-60.

Second, on the record now before the Court, there cannot be any genuine issue as to the fact that when 5K failed to take proper precautions to secure the heat exchangers and one of them subsequently fell off of a truck, 5K breached a duty it had under the Contract. In the Contract, 5K warranted and guaranteed that the heat exchangers would be transported in a "good and workmanlike" to the "full and complete satisfaction" of Dominion. 5K also agreed to ensure that its work complied with all professional standards and applicable government regulations. 5K has not even bothered to argue that the method by which the heat exchangers were moved would be "satisfactory to a reasonable man", see Lambert, at *719-20, and Dominion has presented uncontested evidence showing that the failure to overstrap the heat exchangers was a violation of both professionals standards and applicable government regulations. While 5K may have delegated the duty of securing the loads to Daily Express, it could not delegate its ultimate responsibility for ensuring that this job was done properly. See Walker, at 619 F.2d at 308. Thus, 5K was in breach of the Contract with Dominion.

Third, on the record before the Court, there can be no genuine issue as to the fact the damage to the heat exchangers arose from 5K's breach and that $192,072.50

is both a reasonable and certain measure of damages.  Dominion has presented both a report detailing the manner in which the heat exchanger was damaged and invoices for the repairs performed upon it.  5K has not bothered to contest the evidence presented by Dominion that the failure to properly secure the heat exchangers was the cause of the accident.  While 5K has argued that the amount paid to repair the exchanger has not been proven reasonable, under Virginia law these bills constitute some evidence of the reasonable amount of damages, see Sunrise Cont. Care, LLC, 277 Va. at 148, and, in light of all of the circumstances, this Court is satisfied that the costs are reasonable.  See Atlantic Permanent Federal Sav. and Loan Ass'n, 839 F.2d at 218 (finding that a Virginia court would likely accept such uncontroverted evidence as conclusive).

Fourth, in light of the foregoing, it is clear that Dominion has shown its entitlement to judgment as a matter of law.  Given the size of the damages alleged and the diversity of citizenship between Dominion and 5K, this matter is properly before this Court.  See 28 U.S.C. § 1332.  The parties have stipulated that this contract is governed by Virginia law, and under the law of Virginia a plaintiff in a breach of contract suit must show the existence of a contractual duty, the breach of that duty, and damages flowing from that breach.  See Sunrise Cont. Care, LLC, 277 Va. at 154.  Based on the pleadings, discovery and disclosure materials, and the affidavits filed by the parties, there is no element of this claim upon which a reasonable jury could find otherwise than for Dominion.

To be sure, 5K has raised arguments in which it suggests that even if Dominion has made a prima facie case, summary judgment is inappropriate at this time. However, each of these rests either on an unstable foundation of fact or an infirm construction of the applicable law. 5K has argued that in the absence of a formal work order agreement, it had no obligation to perform under the Contract. However, as the Court has previously explained, the condition precedent to 5K's duty to perform under the contract was a request from Dominion or its authorized representatives, not the filing of a work order agreement imposing additional requirements on 5K. Further, under Virginia law, where a party commences performance, it waives any right to assert condition precedent as defense to a contract. See, e.g., Ehrlich, at 217 Va. at 116. 5K has also argued, although it appeared to abandon these positions at hearing, that Dominion's claims might either be preempted by the Carmack Amendment or barred by the doctrine of laches, since they were not filed within the time periods outlined in the bill of lading prepared by Daily Express. Since 5K is not itself a motor carrier or freight forwarder within the meaning of the Carmack Amendment, see 49 U.S.C. § 13102 (defining terms), the Carmack Amendment has no bearing on the contractual relationship between Dominion and 5K. Further, in light of this Court's recent ruling on Daily Express's Motion to Dismiss 5K's Third Party Complaint, 5K has not been unfairly prejudiced by Dominion's delay in bringing its suit. Moreover, there is authority under Virginia law for the proposition that the doctrine of laches may not be asserted where the statute of limitations on a contract claim has not run, see, e.g., Merrifield Indus. Corp. v.

Glaze, 77 Va. Cir. 264, 270 (2008), and under Virginia law, the statute of limitations on a breach of contract claim is five years. See Va. Code §§ 8.01-243 & 246.

Finally, the Court would like to give special attention to one argument raised by 5K that is particularly troubling. In opposing summary judgment, 5K has advanced the theory that Dominion itself may have given the drivers an instruction not to overstrap the heat exchangers. The basis for this argument is that the unidentified driver of the second Daily Express truck, who was not involved in an accident, overheard a Dominion employee give this instruction. This unidentified employee allegedly repeated this information to the driver of the truck from which the heat exchanger did fall, and this second driver allegedly reported the comment in a report which was read by one of the Daily Express employees who repeated it during a deposition. While it may be true that under Virginia law an injured party cannot recover for a breach of contract when the other party's failure to perform was a result of the injured party's own actions, there is no evidence in the record to support such a defense. All that 5K has proffered in support of this theory are arguments based on compound hearsay. This cannot be considered on a motion for summary judgment. See Maryland Highway Contractors Ass'n, Inc., 933 F.2d at 1251-52 (hearsay excluded); see also Celotex, 477 U.S. at 324 (party cannot rely on arguments in briefs alone). The fact that this type of statement would even be proffered as evidence is disappointing and the parties are advised to consider carefully their theories of admissibility before attempting to introduce this material again.

## IV. CONCLUSION

Since the fact resolution process of trial is unnecessary to the disposition of Dominion's claims and 5K's defenses, the Court finds that summary judgment should be granted to Dominion on both the question of 5K's liability under the Contract and the amount of 5K's liability, which totals $192,072.50 in damages, plus fees and costs.

An appropriate Order shall issue.

                                                                     /s/

                                            James R. Spencer

ENTERED this __8th__ day of March 2010